E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
J. JAMARI BUXTON (Cal. Bar No. 342364)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:   (213) 894-3519/3289
    Facsimile:   (213) 894-0141
    E-mail:   Jamari.Buxton@usdoj.gov
           Susan.Har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>PAUL O. PARADIS,<br><br>        Defendant. | No. CR 21-540-SB<br><br><u>GOVERNMENT'S SENTENCING MEMORANDUM; EXHIBIT A</u><br><br>**[PUBLIC VERSION]**<br><br>Hearing Date:  June 27, 2023<br>Hearing Time:  8:00 a.m.<br>Location:      Courtroom of the Hon.<br>                  Stanley Blumenfeld Jr. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys J. Jamari Buxton and Susan S. Har, hereby files its sentencing memorandum for defendant Paul O. Paradis.

This sentencing memorandum is based upon the attached memorandum of points and authorities, supporting exhibit, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 13, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


      /s/
J. JAMARI BUXTON
SUSAN S. HAR
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                          PAGE

TABLE OF AUTHORITIES ................................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.   INTRODUCTION ................................................................................... 1

II.  STATEMENT OF FACTS OF THE OFFENSE ............................................ 4

    A.   Defendant Helps Orchestrate the Collusive Litigation Scheme and Strikes a Deal for a $2.175 Million Kickback ............................... 4

    B.   Defendant Obtains a $30 Million No-Bid Contract for His Company by Bribing LADWP's General Manager with Future Benefits ................... 6

    C.   Defendant Bribes a LADWP Board Member ............................... 8

III. THE GUIDELINES RANGE ................................................................... 9

    A.   USPO's Calculations and Recommendation ................................ 9

    B.   The Government's Calculation ............................................... 10

IV.  MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE ................................................................................... 10

    A.   Defendant's Substantial Assistance .......................................... 11

    B.   Timeliness and Reliability of Assistance ................................... 13

V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION ..................... 14

    A.   The Nature and Circumstances of the Offense ........................... 14

    B.   History and Characteristics of Defendant .................................. 15

    C.   Extensive Cooperation with the California State Bar ..................... 16

    D.   General and Specific Deterrence ............................................. 18

    E.   Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense ..................... 20

    F.   Avoidance of Sentencing Disparities ........................................ 20

VI.  CONCLUSION ................................................................................... 21

1

# **TABLE OF AUTHORITIES**

2    <u>CASES</u>                                                                     <u>PAGE</u>

3    <u>United States v. Coleman</u>,
4    98 F.3d 1339 (5th Cir. 1996) .......................................................................... 10

5    <u>United States v. Martin</u>,
6       455 F.3d 1227 (11th Cir. 2006) ...................................................... 18, 19, 20

     <u>United States v. Morgan</u>,
7       635 F. App'x 423 (10th Cir. 2015) ...................................................... 20

8    <u>United States v. Musgrave</u>,
9       761 F.3d 602 (6th Cir. 2014) ............................................................... 19

     <u>United States v. Spano</u>,
10      411 F. Supp. 2d 923 (N.D. Ill. 2006) .................................................. 18

11   <u>United States v. Stefonek</u>,
      179 F.3d 1030 (7th Cir. 1999) ............................................................. 19

12   <u>United States v. Treadwell</u>,
13      593 F.3d 990 (9th Cir. 2010) ............................................................... 19

14   <u>STATUTES</u>

15   18 U.S.C. § 3553(a) ....................................................................................... 18
     18 U.S.C. § 3553(a)(6) ................................................................................... 20

16   <u>RULES</u>

17
     U.S.S.G. § 2B1.1(b)(1)(I) ................................................................................. 9
18   U.S.S.G. § 2C1.1(a)(1) ...................................................................................... 9
19   U.S.S.G. § 2C1.1(b)(1) ...................................................................................... 9
     U.S.S.G. § 2C1.1(b)(3) ...................................................................................... 9
20   U.S.S.G. § 5K1.1 ..................................................................... 3, 10, 13, 20, 21

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The City of Los Angeles' (the "City") hiring of defendant Paul Paradis as Special Counsel in late 2014 spawned a tidal wave of criminal acts, corruption, and unethical conduct that infected not only the City Attorney's Office, which appointed defendant to represent the City in litigation related to a botched billing system, but also the Los Angeles Department of Water and Power ("LADWP"), the largest public utility in the country, whose customers were wildly overbilled by the faulty system, and its powerful Board of Commissioners.  Soon after joining the City, defendant – with the knowledge and imprimatur of top City Attorney's Office personnel – helped orchestrate a massive public fraud under which the City, through defendant's behind-the-scenes legal work and maneuvering, effectively sued itself in a class action lawsuit known as Jones v. City. Defendant was the key figure in the City's so-called "white knight" strategy, the goal of which was to consolidate and quickly settle a slew of costly, embarrassing, and politically damaging lawsuits on terms the City wanted.  Without defendant, the collusive litigation would never have occurred.  Defendant was the one who drafted the Jones v. City complaint using confidential information he got from the City; he handpicked a City-friendly plaintiff's attorney from Ohio ("Ohio Attorney") to serve as a straw-lawyer for the Jones v. City class; he crafted Ohio Attorney's settlement demand so that a resolution on terms favorable to the City was a fait accompli; he engaged in a series of sham mediations designed to give the appearance of an adversarial posture between the City and the class; and he helped withhold documents that would reveal the collusive litigation scheme to the court and the public.  Why did defendant, a reputable, long-time attorney, so eagerly and proactively take these wrongful actions?  Pure greed. In yet another layer to his scheme, defendant secretly demanded and obtained an illegal $2,175,000 kickback from the friendly lawyer he selected, representing twenty percent of Ohio Attorney's fees from the Jones v. City case.

The collusive litigation (and over $2 million criminal kickback to secretly line defendant's pockets) was just the start of the staggering scope and nature of defendant's criminal activities and greed.  Far from being satisfied, defendant plotted to get even more money through more crimes and deception.  This included landing a lucrative three-year, $30 million contract to remediate LADWP's billing system for a company he created called Aventador Utility Solutions, LLC ("Aventador").  To secure the colossal "no-bid" contract that sidestepped the standard, competitive request for proposal (RFP) procurement process, defendant bribed LADWP's then-General Manager, David Wright, with a future job as Aventador's CEO, a $1 million annual salary, and a Mercedes in exchange for his support of the contract, which involved persuading LADWP's Board to approve the deal.  Again, defendant secretly worked behind the scenes, ghost-writing ostensibly "independent" reports to the <u>Jones v. City</u> court embellishing the need for and urgency of the proposed Aventador contract, and partnering with Wright to form and refine the narrative that LADWP's leader would use to lobby decisionmakers.  LADWP's Board unanimously approved the Aventador contract, unaware that Wright sang its praises predominantly because defendant had bribed him.  Leaving nothing to chance, defendant secured further support for the Aventador contract – and for future contracts for defendant – by providing benefits to a member of the LADWP Board in the form of ███████████████████████, constituting yet another bribe.  For defendant, paying such bribes along the way was a pittance, given the millions of dollars he was poised to make through Aventador.

Corruption is contagious, and so too was defendant's unlawful conduct.  Most notably, defendant's actions led to multiple extortion plots related to concealing documents that would reveal the collusive litigation scheme.  By early 2019, news reports began to surface describing defendant's role in the collusive litigation, prompting him to abruptly resign as Special Counsel on March 6, 2019.  Sensing the writing was on the wall, defendant began cooperating with the government days later.

Defendant's cooperation for the government was <u>extraordinary</u> from the very outset. Because defendant was the epicenter from which various forms of criminal conduct and other misconduct sprang, he was uniquely qualified to point the government in the direction of wrongdoing so it could investigate its many tentacles. ████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

This Sentencing Memorandum requires the government to perform the challenging task of weighing (among other things) two powerful yet diametrically-opposed factors: defendant's outrageous/pernicious criminal activity versus his extraordinary/impactful cooperation. Had defendant not cooperated, it is possible that the government could not have brought all the charges in this investigation. By the same token, had defendant not engaged in unlawful and corrupt conduct that spread to others, there likely would have been no need for such prosecutions, and the government would not have had to spend years and countless resources investigating this matter.

As explained below, the government moves for a twelve-level downward departure under U.S.S.G. § 5K1.1, based on defendant's cooperation in the federal criminal investigation. The government also recommends an additional four-level variance based on defendant's substantial assistance to the State Bar of California, as well as to account for defendant's mitigating personal history and characteristics. Based

on an adjusted total offense level of 15 and resulting Guidelines range of 18-24 months' imprisonment, the government believes a low-end sentence of 18 months' imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing.

Accordingly, the government respectfully recommends the following sentence: **(1) an 18-month term of imprisonment; (2) a three-year term of supervised release; and (3) a special assessment of $100.**

## II.   STATEMENT OF FACTS OF THE OFFENSE[1]

### A.   Defendant Helps Orchestrate the Collusive Litigation Scheme and Strikes a Deal for a $2.175 Million Kickback

In 2013, LADWP implemented a new billing system it acquired from PricewaterhouseCoopers ("PwC"), leading to hundreds of thousands of inaccurate bills, including wildly overinflated bills. By late 2014, LADWP was facing multiple class action lawsuits related to the bad bills, embroiling the City in a PR nightmare. That December, the City Attorney's Office hired two private attorneys – defendant, a New York lawyer, and Paul Kiesel, a Los Angeles lawyer – as Special Counsel to represent LADWP in an affirmative lawsuit against PwC. At the time, the City was aware that defendant also represented a ratepayer, Antwon Jones, on whose behalf defendant proposed to file a lawsuit against PwC.

In early 2015, the City approved a plan by which defendant and Kiesel would represent both Jones <u>and</u> the City in parallel lawsuits against PwC— <u>i.e.</u>, <u>Jones v. PwC</u> and <u>City v. PwC</u>. Soon after, the City abandoned the plan and pivoted to a new, even more problematic strategy. Under the new plan, top City Attorney's Office personnel directed defendant to find a malleable lawyer for his client, Jones, to sue the City in a "white knight" lawsuit that would allow the City to quickly resolve all existing claims

---

[1] Unless otherwise indicated, all facts herein are drawn from the stipulated factual basis in defendant's plea agreement. (<u>See</u> Dkt. No. 6.)

against it on terms desired by the City.  Defendant and Kiesel, meanwhile, continued to pursue the City v. PwC lawsuit in their roles as Special Counsel.[2]

In furtherance of the white knight strategy, defendant in late February 2015 contacted Ohio Attorney, who is now deceased, and offered the Jones v. City case to him.  Defendant explained the scheme to Ohio Attorney and said that defendant would do all or most of the work in shepherding this "pre-settled" case to its preordained conclusion.[3]  In exchange, defendant demanded a kickback of twenty percent of Ohio Attorney's fees.  Ohio Attorney agreed, after which defendant introduced Jones to Ohio Attorney and led him to believe that Ohio Attorney was a new lawyer working on Jones' case.  At no point did defendant or Ohio Attorney ever disclose to Jones that defendant had been hired to represent the City, whom Jones was suing, in a related matter.

Consistent with the sham arrangement, defendant drafted the Jones v. City complaint using nonpublic information supplied by the City, which Ohio Attorney filed in Los Angeles Superior Court on April 1, 2015.[4]  Soon after, Ohio Attorney sent the City a settlement demand that defendant had likewise drafted.  In those and all other instances, Ohio Attorney passed off defendant's work product as his own, concealing the collusive nature of the litigation from the court and the public.  As planned, the City quickly decided to settle the Jones v. City case with Ohio Attorney.  To give the appearance of legitimacy, however, defendant – representing the City, despite not being counsel of record in Jones v. City – and Ohio Attorney engaged in a series of bogus mediations between 2015 and 2016, wherein the two sides pretended to be adversaries,

---

[2] The City filed the City v. PwC case on March 6, 2015.  The suit generally alleged that PwC was responsible for LAWDP's billing problems.  Defendant and Kiesel represented the City in that action for approximately four years before resigning as Special Counsel in early March 2019.

[3] Because the goal was to resolve the litigation quickly on terms favorable to the City, defendant and Ohio Attorney agreed that Ohio Attorney would not demand any discovery or file any adversarial motions against the City.

[4] Attorney Michael Libman served as local counsel for the Jones v. City class.

even though the City was secretly pulling the strings and even though the key terms of the settlement had already been agreed upon.

In July 2017, the court granted final approval of the parties' requested settlement, which contained terms awarding approximately $19 million in plaintiff attorneys' fees, of which approximately $10.3 million were awarded to Ohio Attorney.[5]  To consummate the agreed-upon kickback, defendant and Ohio Attorney each formed shell companies that would effectuate and conceal the illegal transfer, after which Ohio Attorney gave defendant $2.175 million, representing twenty percent of his fees, disguising the payment as a real estate investment.

### B. Defendant Obtains a $30 Million No-Bid Contract for His Company by Bribing LADWP's General Manager with Future Benefits

The Settlement Agreement in the <u>Jones v. City</u> matter, among other obligations, required LADWP to remediate its billing system and meet various benchmarks over a specific period of time.  In December 2015, the court appointed an independent monitor to oversee LADWP's performance under the Settlement Agreement.  Around the same time, LADWP's Board awarded defendant's law firm a one-year, $1.3 million no-bid contract to manage the billing system remediation project.  In mid-2016, the Board extended the contract for another year and awarded defendant's law firm an additional $4.7 million.

By early 2017, defendant had cultivated a close personal relationship with LADWP General Manager David Wright.  The two traveled together, attended concerts and other events, and dined in expensive restaurants, usually on defendant's dime.  In February 2017, Wright and defendant met privately in Riverside and discussed defendant's plans to form a new company, Aventador, to seek additional billing system

---

[5] As a further fraud on the court and the public, and to ensure that defendant's illegal twenty-percent kickback would be as high as possible, defendant directed Ohio Attorney to submit false billing records artificially inflating the attorney's fees award. Accordingly, Ohio Attorney falsely attested to work he purportedly performed on the case that either was actually secretly done by defendant or never done at all.

6

remediation and cybersecurity work from LADWP.[6]  They eventually spoke about ways Wright could benefit financially from Aventador, and Wright told defendant that he would support a massive $30,000,000 no-bid remediation contract for Aventador if defendant guaranteed him a job as CEO of Aventador upon his retirement from LADWP, an annual salary of $1,000,000, and a Mercedes.  Defendant agreed.

Throughout the spring, defendant and Wright worked to line up support for the Aventador contract.  Among other tactics, defendant cozied up to the court-appointed independent monitor in the Jones v. City case, who was required to file periodic reports describing LADWP's progress in meeting its remediation obligations under the Settlement Agreement.  Defendant took the independent monitor out to sporting events and meals and routinely drafted his reports to the court.  In May 2017, defendant drafted one such report with the specific goal of providing Wright with talking points to persuade the LADWP Board to approve the Aventador contract.  The report claimed that LADWP had no choice but to procure remediation services from an outside vendor because LADWP was woefully understaffed in the IT area, lacked competent IT project managers, and could not successfully manage large-scale IT implementation projects.  Paradis and Wright discussed this strategy, and Wright reviewed and authorized the language that Paradis included in the report for the court.

Defendant and Wright infused this narrative into a myriad of items, including a letter to the LADWP Board explaining why alternatives to awarding the Aventador contract on a no-bid basis were unworkable.  They also crafted Wright's oral and written presentation to the LADWP Board touting the Aventador contract, strategized about removing impediments to the contract, and took various steps to obscure and/or hide defendant's relationship to Aventador.

The LADWP Board met to consider the Aventador contract and other items on June 6, 2017.  In his presentation to the Board before the vote, Wright – consistent with

---

[6] Defendant determined that State Bar rules prohibited his law firm from providing non-legal services, such as remediation and cybersecurity work, to the City.

his plan with defendant – cited the May 2017 periodic report secretly drafted by defendant and warned that LADWP could not meet its obligations under the <u>Jones v. City</u> Settlement Agreement unless it contracted with Aventador, repeatedly conveying a sense of urgency to the Board.

Following Wright's comments, the LADWP Board voted unanimously to approve the $30 million no-bid contract.  Over the next several years, through February 2019, defendant and Wright continued to strategize and position Aventador for other business opportunities, both inside and outside LADWP.

### C.    Defendant Bribes a LADWP Board Member

To ensure that defendant would secure the LADWP Board's approval of the Aventador contract, defendant also bribed a Board member.  In the weeks before the vote on the Aventador contract, a member of the LADWP Board ("Board Member") conveyed to various people, including Wright and defendant, that █ had concerns about the Aventador contract.  About a week before the vote, Board Member ███████ began asking defendant for ████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████ Intending to influence Board Member's vote on the Aventador contract, defendant provided the ████████████████████████████████ to Board Member.

Days before the vote, Board Member changed █ tune and informed others █ would vote in favor of the contract.  On the day of the vote, defendant ran into Board Member in the hallway, and █ signaled to defendant that █ would support the Aventador contract if defendant continued to provide ████████████ to Board Member, saying words to the effect of, "You take care of me, I take care of you." Hours after the Board approved the $30 million Aventador contract, Board Member sent defendant a colleague's email address, and defendant emailed that person ██████ ████████████████████████████████████████████████ ██████ Over the next several months, defendant and his law partner continued to

8

1   ███████████████████████████   for Board Member based on defendant's understanding that

2   he was doing so in exchange for Board Member's support of the Aventador contract, as

3   well as future contracts defendant might seek.  In total, ████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████

## III.   THE GUIDELINES RANGE

### A.   USPO's Calculations and Recommendation

On June 7, 2022, the United States Probation Office ("USPO") issued the

presentence investigation report (Dkt. No. 26 ["PSR"]), along with a disclosed

recommendation letter (Dkt. No. 25).  The PSR found that the following sentencing

Guidelines factors applied:

| | | |
|---|---|---|
| Base Offense Level: | 14 | [U.S.S.G. § 2C1.1(a)(1)] |
| Value of bribe between $1.500.000-$3.500.000 | +16 | [U.S.S.G. § 2B1.1(b)(1)(I)] |
| Offense involved more than one bribe | +2 | [U.S.S.G. § 2C1.1(b)(1)] |
| Offense involved high-level/sensitive position | +4 | [U.S.S.G. § 2C1.1(b)(3)] |
| Acceptance of responsibility | - 3 | [U.S.S.G. § 3E1.1] |
| Total Offense Level | **33** | |

(PSR ¶¶ 77-94.)  The PSR indicated that defendant had no criminal history points,

yielding a score of zero and a criminal history category of I.  (Id. ¶¶ 98-99.)  Based on a

total offense level of 33 and a criminal history category of I, the resulting advisory

Guidelines range is 135-168 months; however, because the statutory maximum sentence

for the offense is ten years, the USPO calculated defendant's advisory Guidelines range as 120 months.  (Id. ¶ 138.) [7]

The USPO's letter, which does not address defendant's cooperation with the government or the State Bar, recommended a sentence of 12 months' imprisonment (i.e., the statutory maximum).  (Dkt. No. 25 at 1.)  The letter notes several mitigating factors, namely, that defendant experienced a challenging upbringing including a violent father and a mother who struggled to provide for the family.  (Id. at 6.)  The letter also identifies several aggravating factors, including that the "offense involved numerous and repeated criminal acts over a period of years," and that defendant "had the means and abilities to earn an honest living, and instead engaged in the instant offense."  (Id.)

## B.   The Government's Calculation

The government concurs with the PSR's initial calculation of the Guidelines prior to any consideration of a departure or variance for defendant's substantial assistance with the government and the State Bar.  After the government's recommended collective 16-level departure and variance, the adjusted **total offense level is 15, resulting in a Guidelines range of 18-24 months**.  As explained below, the government recommends a sentence at the low-end of that adjusted range; that is, **18 months'** imprisonment.

## IV.   MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE

---

[7] See U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.")  Defendant's offense level, and the starting point from which the Court departs, would therefore become 31, i.e., the highest offense level (assuming a CHC of I) that incorporates a sentence of 120 months.  See United States v. Coleman, 98 F.3d 1339 (5th Cir. 1996) (unpublished) ("the departure is subtracted from the statutory maximum, not from the guideline range as otherwise calculated.").







\*  \*  \*

Based on the foregoing, the government believes a 12-level departure under U.S.S.G. § 5K1.1 is warranted and appropriate, and hereby moves for such a departure.[10]

---

[10] Defendant's cooperation with the State Bar, which the government believes is an appropriate basis for a variance, is separately addressed and described in more detail below.  (See infra, Section V.C.)

13

## V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION

The government's recommended sentence of 18 months' imprisonment is sufficient, but no greater than necessary, to achieve the goals of sentencing.  An 18-month term of imprisonment is a meaningful custodial sentence that accounts for the seriousness of defendant's crimes, furthers the need for deterrence, promotes respect for the law, and provides just punishment.  At the same time, the recommended sentence, which reflects a collective 16-level departure and variance from the otherwise applicable Guidelines, appropriately acknowledges and rewards defendant's substantial cooperation with the government and the State Bar, and accounts for mitigation in his personal history and characteristics.

### A.    The Nature and Circumstances of the Offense

Defendant's criminal conduct was outrageous, longstanding, proactive, conniving, and damaging to the citizens of Los Angeles and beyond.  Almost immediately after joining the City as Special Counsel, defendant abused his special position of power by effectuating the collusive litigation scheme.  By enabling the City to sue itself to quickly resolve the billing system lawsuits on terms it wanted, simultaneously alleviating the City's ongoing PR nightmare, defendant betrayed not only his client (Jones), but also the court, City ratepayers, and the public at large.  Motivated by greed, defendant profited handsomely from the fraud by demanding and receiving a $2.175 million kickback from the straw-attorney he hand-selected as part of the white knight strategy.  Hungry for even more money, defendant proceeded to engage in two other bribery schemes.  In one, defendant got his company, Aventador, a massive $30 million no-bid contract[11] by promising benefits to LADWP's General Manager, Wright.  In the other, defendant secured further support for the Aventador contact, as well as future contracts, by buying ████████████████ a LADWP Board Member.

---

[11] ████████████████████████████████████████
████████████████████████████████████████

Each scheme was entrenched with layers of defendant's manipulation, deception, and fraud.  To enable the collusive litigation, defendant fraudulently drafted the <u>Jones</u> documents, engaged in sham mediation sessions, and directed fraudulent billing records to be provided to the court.  To collect his illegal kickback, defendant set up a shell company and lied about the purpose of the company and the transaction.  Likewise, to enable the Aventador contract, defendant drafted the independent monitor's reports, struck a secret deal with a Board Member ███████████, and directed his bribery partner-in-crime, Wright, from behind the scenes with various scare tactics to rush the LADWP Board into approving the multi-million-dollar no-bid contract.

Defendant's misconduct was doubly pernicious.  As with all corruption, it further eroded the public's trust in its own institutions.  It also inspired other misconduct, including multiple extortion schemes, further harming the City and its citizens.  These facts are aggravating and demanding of a custodial sentence.

### B. History and Characteristics of Defendant

Despite a tumultuous early childhood, in which defendant's father, who suffered from bipolar disorder and PTSD, was often violent (PSR ¶ 105), defendant managed to thrive both personally and professionally.  After graduating high school, defendant went on to receive a Bachelor of Science degree from Bentley College, a law degree from New York Law School, and he became a member of the New York State bar.  (<u>Id.</u> ¶¶ 120-121).[12]  More recently, defendant has been working toward a master's degree in cybertechnology from the University of Maryland.  (<u>Id.</u> ¶ 120.)  Defendant was also married for nearly thirty years,[13] and he has two adult children that he raised and with whom he remains very close.  (<u>Id.</u> ¶¶ 110-111).

A successful attorney, defendant was co-lead counsel in the Enron matter, one of the biggest cases in American history, wherein he managed 150 lawyers across multiple states, deposed high-level accountants and IT employees, and helped secure a whopping

---

[12] Defendant was disbarred in 2022.

[13] Defendant and his ex-wife divorced in 2015.

$2.4 billion settlement.  (Id. ¶ 122.)  In 2007, defendant founded his own firm, Paradis Law Group, PLLC, in New York, where he served as its managing partner.  (Id. ¶ 127.) Defendant was again successful, earning upwards of $400,000 in some years.  (Id.) Later, after becoming Special Counsel for the City, defendant secured a series of lucrative remediation contracts for his companies valued at $1.3 million (2015), $4.7 million (2016), and $30 million (the bribery-fueled Aventador contract in 2017).  (Id. ¶¶ 44-45, 59).  Even after he resigned from the City in disgrace in 2019, defendant went on to secure jobs in Arizona negotiating contracts for a bank, earning the equivalent of $100,000 per year, and as the COO of a consulting company, where his salary was $300,000 per year.  (Id. ¶ 124.)

**C.    Extensive Cooperation with the California State Bar**





Based on defendant's cooperation with the State Bar's significant investigation, as well as mitigating aspects of defendant's history and characteristics, the government recommends a **4-level downward variance under 18 U.S.C. § 3553(a)**.

### D.   General and Specific Deterrence

The strong need for general deterrence in this case supports the government's recommended sentence.  Public corruption cases such as this one demand strong general deterrence.  As one court noted:

> ***Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable***.  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  ***It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all*** — not only to the average citizen, but to all elected and appointed officials.

United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006) (emphasis added).  General deterrence is a particularly effective tool in corruption and other white-collar cases, as white-collar criminals often premeditate their crimes and engage in a cost-benefit analysis.  See, e.g., United States v. Martin, 455

18

F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").  That was certainly the case here, where defendant engaged in <u>three</u> different bribery schemes (the $2.175 million kickback from Ohio Attorney, the $30 million Aventador contract, and providing ▮▮▮▮▮▮▮▮ to win Board Member's favor) and helped orchestrate a massive fraud on the <u>Jones v. City</u> court and the public though the collusive litigation scheme.

A custodial sentence will aid in achieving the critical need for general deterrence, while also rejecting the notion of a two-tier system of justice—a more flexible and lenient tier for well-heeled white-collar defendants, and a more rigid, severe, and guidelines-oriented tier for "other" criminals.  <u>See</u> <u>United States v. Musgrave</u>, 761 F.3d 602, 609 (6th Cir. 2014) (central reason for sentencing guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." (citation omitted)).  That dichotomy is inconsistent with the Constitution, with fundamental fairness, and with the statutory goals of sentencing, and it has been repeatedly repudiated by the courts.  <u>See</u> <u>United States v. Treadwell</u>, 593 F.3d 990, 1012–13 (9th Cir. 2010) (overruled on other grounds) (rejecting the principle that a defendant of means should be afforded a lower prison sentence to enable him to pay restitution to his fraud victims, and noting the critical importance of "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail" (citation omitted)); <u>United States v. Stefonek</u>, 179 F.3d 1030, 1038 (7th Cir. 1999) (White-collar criminals are "not to be treated more leniently than members of the 'criminal class'").  A meaningful sentence in this closely-watched public corruption case will thus serve an important public purpose.

This case also reflects some need for specific deterrence.  As discussed above, defendant has secured multiple high-paying jobs (including an executive role) since leaving his Special Counsel position in March 2019, and it is not hard to imagine

19

defendant once again having significant power and influence within another government agency or a major company.  A custodial sentence will send a strong message to this particular defendant that will hopefully discourage him from engaging in future unlawful and/or unethical behavior.

### E.   Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A custodial sentence is also necessary to reflect the serious nature of defendant's crime, punish defendant's conduct, promote respect for the law, and restore public faith in the system.  As one court has observed: "The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself."  United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015).  Here, the appropriate judicial response to defendant's inexcusable and criminal abuse of the public trust, motivated by his own greed and self-interest, warrants a meaningful custodial sentence like the one the government recommends.  To otherwise sentence defendant to a noncustodial sentence, notwithstanding defendant's valuable cooperation, would leave these important goals of sentencing unmet.  See Martin, 455 F.3d at 1238 ("Martin's cooperation, while commendable and extremely valuable, is not a get-out-of-jail-free card.  Martin's cooperation does not wash the slate clean.").

### F.   Avoidance of Sentencing Disparities

The Court is also to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  18 U.S.C. § 3553(a)(6).  The Court has already sentenced three defendants in related matters: David Wright, David Alexander, and Thomas Peters.  Defendant is distinguishable from all three of these other defendants.  For one thing, defendant's conduct, which involved three instances of bribery and many acts to carry out the collusive litigation scheme, is far more aggravating than that of Wright, Alexander, and Peters combined.  Second, and conversely, neither Wright nor Alexander received § 5K1.1 consideration, and the scope, value, and impact of defendant's cooperation was

far more extensive than that provided by Peters, as reflected in the government's respective recommended § 5K1.1 departures.[16]  Put simply, defendant is in a category of his own.  Thus, applying the government's recommended collective 16-level downward departure and variance and then sentencing defendant within the resulting Guidelines range will aid in avoiding unwarranted sentencing disparities.

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (1) 18 months' imprisonment; (2) a three-year term of supervised release; and (3) a special assessment of $100.[17]

---

[16] Of course, as is the constant tension in this case, defendant was able to provide far more cooperation than Peters because he was far more culpable than Peters.

[17] ████████████████████████████████████████████████